**Opinion issued April 11, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00765-CV**

———————————

## IN THE INTEREST OF C.C. AKA C.C., A CHILD

———————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-00988J**

———————————

## MEMORANDUM OPINION

Mother and Father appeal the trial court's order terminating their parental rights to their child C.C. For her part, Mother contends the evidence was legally and factually insufficient to show that she knowingly placed or allowed C.C. to remain in conditions that endangered C.C.'s physical or emotional well-being; she failed to comply with a court order establishing the actions necessary for C.C.'s return; and

termination of her parental rights was in C.C.'s best interest.[1] For his part, Father contends the evidence was legally and factually insufficient to show that he engaged, or knowingly placed C.C. with someone who engaged, in conduct that endangered C.C.'s physical or emotional well-being; he failed to comply with a court order establishing the actions necessary for C.C.'s return; and termination of his parental rights was in C.C.'s best interest.[2]

We affirm.

## Background

C.C. was born in May 2022. Over a two-day period in June 2022, the Texas Department of Family and Protective Services received several referrals against Mother for neglectful supervision of C.C. The first referral followed a fight between Mother and Father that became violent. Law enforcement visited the family's home and saw cuts on Father's eyelid and upper brow. Mother allegedly had thrown objects, including pots and bowls, at Father.

Another referral alleged that Mother experienced a "mental health episode," set her apartment on fire with C.C. inside, carried C.C. to a nearby park with a bayou, and threw C.C. to the ground. The Department's referral affidavit stated that

---

[1]    *See* TEX. FAM. CODE § 161.001(b)(1)(D), (O), (b)(2).

[2]    *Id.* § 161.001(b)(1)(E), (O), (b)(2).

2

neighbors had helped save C.C., who suffered smoke inhalation. A medical examination of C.C. at a hospital revealed a subarachnoid hemorrhage.[3]

At the hospital, the Department's investigator, C. Cobb, noticed red marks on C.C.'s forehead. Cobb interviewed Father with the assistance of an interpreter.[4] Father said that he had not been involved with the Department before, did not have any criminal history, and was the only person who could care for C.C. But he did not have a support system. Father said that he was originally from China but had lived in the United States for 15 years, including in Minnesota, California, and Texas. He initially claimed to be single but later admitted to being in a relationship with Mother, who hit him. Describing one incident that became violent, Father recalled that Mother hit him because she believed he was in contact with an ex-girlfriend. According to Father, he did not retaliate and instead went to a friend's place. When he left, C.C. was in the room sleeping and was in Mother's care. Later, he learned about the fire from a friend and about C.C.'s hospitalization from law enforcement.

Father claimed that Mother had a mental illness, though he did not know her specific diagnosis. Cobb spoke with a social worker at HCA West Houston Medical

---

[3]     Other parts of the referral affidavit describe C.C.'s head injury as a "subarachnoid hematoma" with no skull fracture, rather than as a hemorrhage.

[4]     Father is Chinese, and Mother is Taiwanese. Both used the services of an interpreter to communicate with the Department at times.

Center, who stated that Mother was admitted to the hospital and would be seen by a psychiatrist. The social worker explained that Mother would remain at the hospital until she could be transferred to another facility or was cleared to go home. Mother told the social worker that she had a procurer who forced her into prostitution and abused her. Mother also reported having over $15,000 in cash on her.

During her interview with Cobb, Mother admitted that C.C. hit her head and inhaled smoke from the fire. She also admitted that she and Father argued, but she denied drinking, using drugs, or having any mental illness. As for the apartment fire, Mother's story was inconsistent. Mother stated that she arrived at the apartment to drop off Father's clothes and that she had left C.C. in a small garden at the park by herself. But Mother also said that C.C. had inhaled smoke, she took C.C. to the bayou to get some water to drink, she wanted to give C.C. to police, and law enforcement were not gentle with C.C. when they arrived on the scene of the fire.

Mother also told Cobb that Father was in the business of selling girls for money and had offered to sell C.C. Mother said Father had given her $17,000 in cash, Chanel bags and shoes, and $8,000 worth of jewelry. Both parents gave inconsistent accounts of how they earned the money for these things, but Mother claimed that she could earn up to $5,000 in a day by selling her body. But she did not want to do that sort of work; instead, she wanted to be a beautician. Asked if she had family or other friends in Houston, Mother answered that she had a friend, but

4

that person also was involved with human trafficking. Mother said that she could afford to live separately from Father, she did not want to see Father again, and she did not want him to know where she would be living.

Cobb also spoke with a detective about the fire at Mother's and Father's home. The detective told Cobb that Father was at the scene of the apartment fire and that hundreds of condoms and baby items were found on a burned mattress box spring in the bedroom. There were questions whether Father told the truth about his address and employment. Although he represented to the Department that he lived in an apartment belonging to a friend, the apartment was in Father's name. The detective also doubted that Father was a waiter, as Father claimed, because Father drove a Porsche with California license plates and wore expensive designer shoes. The address listed as the home for C.C. on her birth certificate was a known gambling house and brothel where women were being trafficked.

A social worker at the hospital where C.C. was born told Cobb that Mother's mental health was not a concern when she was released after C.C.'s birth. But the social worker later worried that Mother showed signs of postpartum psychosis when Father visited the hospital and told a physician that Mother was violent, broke a neighbor's window, and refused to seek help.

Based on its investigation, the Department petitioned to terminate Mother's and Father's parental rights and obtained temporary managing conservatorship of

C.C. pending the final hearing. The Department's primary permanency goal was unrelated adoption, or in the alternative, unrelated conservatorship.

Both parents' family service plans were filed with and approved by the trial court. For her part, Mother needed to find employment; find safe, stable, and sanitary housing; complete parenting classes; maintain communication with the caseworker; notify the caseworker within 24 hours of a relocation; provide identifying information of home occupants within 48 hours of that person moving in; submit to a psychological evaluation and follow all recommendations; and complete domestic violence classes. And for his part, Father needed to find employment; find safe and stable housing; notify the caseworker within 24 hours of a relocation; provide identifying information of home occupants within 48 hours of that person moving in; complete parenting classes; maintain communication with the caseworker; attend all visits, court hearings, meetings, conferences, and notify the caseworker of late or missed visits, hearings, meetings, or conferences 24 hours in advance; establish paternity; submit to a psychosocial assessment and follow all recommendations; and not engage in criminal activity.

In a permanency progress report, the Department noted that C.C. had remained in the same foster home since her removal. Among other things, the report described C.C.'s developing personality, progress in physical therapy, and achievement of developmental milestones.

The report also discussed Mother's progress with her family service plan. The report stated that Mother submitted to a psychosocial assessment in January 2023. It recommended that Mother do "individual counseling, parenting classes, work on accountability, increasing insight and judgement [sic], [and] increase culture awareness." Mother also submitted to a psychological evaluation. According to the report, Mother "chose not to disclose certain facts of her psychosocial history during the clinical interview" and "appeared to have the presence of a mental health condition that she did not want to acknowledge." The report noted that Mother's "untreated mental health symptoms" may impact her ability to "effectively care" for and "remain protective" of C.C. Additionally, it expressed concern for whether Mother had "the emotional and financial skills to independently care for [C.C.]" or required "the help of more responsible parties."

Mother was diagnosed with unspecified depressive disorder with "possible psychotic features" and was recommended to take parenting classes; participate in individual therapy; show mood and behavior stability; increase her parenting knowledge; and provide a safe and protective home environment for C.C.

After completing parenting classes and individual counseling, Mother was referred to domestic violence classes. But Mother was not compliant with her service plan requirement to obtain safe housing. The report notes that she resided with

Father, neither of whom provided a lease agreement or any housing verification to the Department. Mother also did not provide any proof of income.

The report also addressed Father's family-service-plan progress. It stated that Father completed his psychosocial assessment in November 2022. The recommendations were for Father to do individual counseling and parenting classes. The report noted that Father claimed he had never been arrested or incarcerated, was minimally cooperative during the session, and seemed to withhold information from the therapist about the nature of the Department's case. Although he completed the parenting classes and individual counseling, Father's FBI background check showed 15 criminal charges from 2007 through 2021. Father was also ordered to provide proof of income through employment paystubs or a letter. The report noted that Father provided three paycheck stubs, but no one was able to confirm Father's employment with the employer.

Father was also not compliant with his family service plan's requirement to obtain stable housing. He had moved three times during the case. And when the caseworker, T. McCray, and child advocate, S. Bieniawski, conducted a joint home visit at his third residence, Father did not provide a lease agreement or any other form of documentation.

The record also contains the child advocate's report noting C.C.'s various medical conditions and needs. At two months, C.C. exhibited poor trunk and neck

control and a 50% delay in gross motor skills. Her head was not in midline, her left eye turned slightly inward, and she walked with her left foot turned inward. She attended weekly physical therapy and, with the help of her foster parents and daycare providers, did additional "stretches and exercises" outside of physical therapy. Additionally, to monitor potential developmental concerns, C.C. would need to see a neurologist until for at least another year and a half.

The child advocate recommended that Mother's parental rights be terminated because C.C. would be at a high risk of emotional and physical harm. Mother pleaded guilty to child endangerment for setting the home on fire, taking C.C. into the burning apartment, and throwing her over a fence, for which Mother received deferred adjudication in March 2023.

The child advocate also recommended that Father's parental rights be terminated because Father had not prioritized C.C.'s return over allowing Mother to move back in with him, despite knowing that Mother is not allowed to have contact with C.C. or any other minor. Father also bonded Mother out of jail by borrowing $20,000 from a friend.

Father's criminal record was extensive, including 13 felony convictions in Utah for identity theft and additional charges for identity theft in Minnesota. This included:

- illegal entry of alien at improper time or place and concealment of facts in January 2007;

- felony possession of a forged writing or device in June 2010;

- four misdemeanor theft counts in July 2010;

- several felony and misdemeanor charges for fraud, theft, or other financial crimes in November 2013;

- felony identity theft in March 2017;

- driving without a valid driver's license, a misdemeanor, in January 2020; and

- a misdemeanor charge arising from unlawful window tinting on a vehicle in January 2021.

At trial, caseworker McCray testified. He testified that C.C. was almost 15 months old and had been in the same foster home since her removal in June 2022. McCray explained that C.C. was removed because of Mother's attempt to "dispose of her" after setting the home on fire, which resulted in C.C.'s various injuries.

McCray explained that after the Department obtained temporary managing conservatorship of C.C., Mother was ordered to complete a family service plan. As part of her plan, Mother was required to provide proof of stable housing, proof of employment with three paycheck stubs, and submit to psychosocial and psychological assessments. But Mother did not provide proof of employment. She also did not provide proof of her own housing and instead lived with Father after being released from jail. Although she completed parenting classes and the

psychosocial and psychological assessment, she was not truthful during the assessment and did not complete the recommendations from the assessment.

Mother also did not complete the recommendations from her domestic violence classes. McCray testified that Mother called him in June, frantic after Father struck her in the head several times. Mother also texted him about a separate incident in which Father pulled a knife on her.

As for Father's service plan, McCray explained that the Department had several concerns about Father's housing. One issue was that Father's brother lived in the home, but Father did not want to provide any information to the Department about his brother. Another issue was that the lease Father provided did not contain any verifiable information and did not look like any lease agreement McCray had seen before. Finally, Father had moved three times during the case, and each residence had cleanliness issues.

McCray also testified that Father was unemployed. And the Department could not verify his previous employment at the Charming Cafe. When Father was visited at work, his employer could not "identify [Father's] timesheet" or say when he comes to work, and there were conflicting reports about his job description and details. In other words, nobody "could confirm that he, in fact, worked there." And later, Father stated that he did not work there.

11

On Father's other family service plan requirements, McCray testified that the therapist who performed Father's psychosocial assessment did not believe Father was truthful, specifically concerning his criminal history. Father also did not attend all visitations with C.C., including in her birth month.

Mother's friend, N. Le, also testified. Le said that she was part of Mother's support system and wanted C.C. to be placed with her. But she admitted that she never reached out to McCray to be considered as a placement. Le had known Mother for about three months, after meeting Mother at a restaurant. After knowing Mother for one or two weeks, Le allowed Mother to move in with her. But Mother had since returned to live with Father despite Mother claiming that Father slapped her. Le also testified that Mother was pregnant again.

Child advocate, S. Bieniawski, testified about C.C.'s bond with her foster parents. She said:

> They are bonded like any other parent and child. They have a wonderful relationship. She seems to be really happy and engaged. They obviously love her deeply. They are on top of everything, medical and dental, and it's very important to her that she has a lot of experiences, a lot of cultural experiences. She has all kinds of toys. She's got books in Mandarin, a Chinese baby doll. Both [C.C.] and her parents are devoted and delighted with each other.

Bieniawski recommended termination of Mother's and Father's rights to C.C. Bieniawski worried that Mother continued to return to Father, whom Mother claimed abused her, and had no plans for supporting C.C. Additionally, Bieniawski was

12

concerned that Father had lived in three different homes in one year and that someone whom Father identified as his brother lived in one of the residences without notifying the Department as required. Bieniawski tried to verify Father's employment by visiting the Charming Cafe twice, but the manager she spoke with had never heard of Father. Beside the two paycheck stubs she saw, there was no other verification that Father worked at the Charming Cafe.

Father told Bieniawski that he borrowed $20,000 from a friend to bond Mother out of jail, but Bieniawski had not independently verified that claim. When she visited Father's home, she saw Tiffany jewelry and a designer handbag. She also noted that Father drove a Porsche. She asked Father whether he had any other income source because those items did not seem affordable on his pay as a restaurant worker. Bieniawski worried that Father was engaging in illegal activity.

In his testimony, Father admitted that Mother stayed with him for one or two months after he bonded her out of jail. But she no longer lived with him, and he did not know where she currently resided. Father denied hitting Mother, alleging instead that she hit him. He also claimed that the Porsche Bieniawski saw did not belong to him and was borrowed from a friend. And although he acknowledged the Tiffany jewelry, he denied that the cash Mother had at the hospital belonged to him. As for his criminal history, Father said, "I did have a criminal record; however, the offense was not occurring in Texas." Asked how many times he had been arrested, Father

replied, "Once, twice. I think three times. Yes, three times." Asked why he denied ever being arrested or incarcerated in the psychosocial assessment, Father admitted that he "didn't really want to tell them whether [he had] a criminal record or not."

Father claimed that the fire occurred not in his apartment, but an apartment that belonged to a friend. When asked what he and Mother did for work in 2021 and 2022, Father denied knowing what Mother did and claimed that he did not work for those two years because he had saved money. Father claimed that he worked at a restaurant in Minnesota before moving to Texas.

Father was asked whether he transported Mother to the last parent-child visit earlier that month, and he denied doing so. When the foster parents' attorney asked when he was last employed Father responded that it was about a month ago at Friendship BBQ. As for plans for who would take care of C.C. if she were to be returned to Father, he answered that he would take care of her, his aunt would help take care of her, or she could be placed in daycare. When asked whether those plans involving the aunt meant he would move to Las Vegas, where she is located, Father answered, "it all depends."

C.C.'s attorney ad litem asked Father if he believes that Mother lies all the time. Father disagreed but said Mother had not told the truth when she alleged that he was trafficking girls, selling her for prostitution, or trying to sell C.C. Father did not believe that Mother committed arson or endangered C.C. Father's employment

14

at Charming Cafe was discussed again. Father stated that he was a cook and worked there from July 2022 through February or March 2023. He stated that he earned about $4,000.00 per month but never learned the owner's name. Father testified that after working at Charming Cafe, he got a job at Friendship BBQ, earning $3,695 per month.

Foster Mother testified that when C.C. arrived in her home, C.C. was underweight, had a scar on her left ankle, and had a subdural hematoma. C.C. visits Texas Children's Hospital quarterly to protect against any long-term brain injury or developmental issues. As for C.C.'s current health, Foster Mother stated that C.C. is meeting developmental milestones but has some physical disabilities and requires physical therapy three times per month. C.C. also completes at-home exercises to help her meet the physical therapy goals. Foster Mother described C.C.'s other medical appointments, including ENT visits for recurring ear infections and eye doctor appoints for her left eye, which turned inward slightly and might be related to the head trauma C.C. sustained.

Foster Mother also testified that she desired to adopt C.C. Asked about her plans for C.C.'s adoption, she explained:

> One of the main things we want to do is continue to incorporate her culture, so we've talked a lot about putting her in Mandarin classes. We would like to continue to offer her all the opportunities to explore and develop with travelling, swimming lessons and continued involvement with our community, with our family, with our friends, holidays, [and] building our own traditions.

15

Foster Mother stated they have family in the Houston area as well as across the country, many of whom flew in for C.C.'s birthday party in May.

As for Father, Foster Mother testified that he had missed 29 percent of the total scheduled visits with C.C. and 40 percent of the visits scheduled since trial began. Father did not appear for C.C.'s birthday month visits. And after some visits with Father, C.C. returned to the foster home with a soiled diaper.

After the State rested, Mother testified. She stated that she completed individual counseling as well as the parenting classes, adding that she learned how to be an appropriate parent. Mother stated she was working on her immigration status so she can stay permanently and work in the United States. When asked whether she understood all her conversations with the caseworker, Mother claimed that "sometimes when we communicate through the phone, [she] couldn't understand some of his English."

As for the allegations of domestic violence between the parents, Mother refused to answer whether she told the caseworker she was leaving Father because he assaulted her. When asked again, Mother explained that she told the caseworker that they had "some altercation" but she "really didn't say that [she] was hit by him." Mother also denied her previous allegations that Father had sex trafficked her and that she was a sex worker. When asked why C.C. had a brain injury when she came into the Department's care Mother responded, "I don't really know."

Mother did not answer whether she was a permanent resident or had permission to live in the United States. Mother was similarly unable to answer what kind of visa she obtained to enter the United States. Mother testified that she lived "close to Chinatown" at the time of trial, but she did not provide the address. She also could not say how many adults live in the home with her. She also could not provide the name of Father's relative whom she wanted the Department to consider for placement of C.C., saying that she only knew her as "auntie or aunt." She did not want to answer whether she was pregnant or receiving prenatal care.

Although she admitted pleading guilty to endangering a child, Mother denied that she endangered C.C., explaining that she was misunderstood by the pedestrian who called law enforcement because that person thought she planned to throw C.C. into the water. Regarding her relationship with Father, Mother described it as good despite there being a chance of argument. When asked whether she intends to get back together with Father, Mother replied that her "first priority is for [her] personal development and also [to make] a good future for [herself]." She denied ever experiencing physical violence "to the point that someone beat each other [sic] or caused bleeding or anything," but acknowledged some fights "in terms of perhaps oral altercations."

When then asked about the altercation that led to her leaving Father, Mother stated, "Well, the fighting or altercations versus whether I will leave him or not

17

because of that, I think these are two matters." When asked whether she told Le that she needed a place to stay because Father was beating her, Mother answered, "Well, what I told her was that we had a fight before occasionally, but never a point that the violence had been pursued to the point [of] bleeding or anything that is harmful." When asked again if she moved back in with Father after leaving Le, Mother responded, "I was only staying in his place for maybe one or two days and that way I can retrieve my belongings. Do you count that as I was returning to him?"

When asked whether Mother had postpartum depression after C.C. was born, Mother responded, "Yes. Because I miss my family members a lot." When asked how she knew that she had that depression, Mother stated that it was because her friends thought she behaved quite differently than before the baby was born. Mother explained that she did not receive any treatment for her depression, saying that she did not really know that this condition required medical treatment.

The trial court rendered a judgment terminating Mother's and Father's parental rights and awarding the Department sole managing conservatorship of C.C. The trial court found that:

- Mother knowingly placed or knowingly allowed C.C. to remain in conditions or surroundings which endangered C.C.'s physical or emotional well-being under Family Code subsection 161.001(b)(1)(D);

- Both Mother and Father failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain C.C.'s return under subsection 161.001(b)(1)(O); and

- Neither Mother nor Father raised a defense based on Family Code section 161.001(d) to the subsection (O) finding and, even if they had, they did not show by a preponderance of the evidence that they (1) were unable to comply with a specific provision of the court order and (2) made a good faith effort to comply with the order but was unable to through no fault of their own.

Both Mother and Father appealed.

## Standard of Review

Parents have a "commanding" interest in the "accuracy and justice" of the decision to terminate their parental rights. *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *In re J.G.S.*, 574 S.W.3d 101, 113 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). But the rights of the natural parent "are not absolute" because "protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)).

A trial court may terminate parental rights on clear and convincing evidence that (1) the parent committed a predicate act listed in Family Code section 161.001(b)(1); and (2) termination of parental rights is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b); *see In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or

conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002).

In a legal sufficiency review, we consider all the evidence in the light most favorable to the findings, assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and disregard evidence that a reasonable factfinder could have disbelieved. *In re J.F.C.*, 96 S.W.3d at 266. We must determine if a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). But we may not disregard undisputed facts that do not support the finding. *Id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *Id.*

In a factual sufficiency review, we weigh disputed evidence contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* If, considering the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. But we must "still provide due deference to the decisions of the factfinder, who, having full opportunity to observe

20

witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

A single predicate finding is enough to support a termination judgment when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362. Thus, if multiple predicate grounds are found by the trial court, we may affirm on any one ground. *See In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.— Houston [1st Dist.] 2013, no pet.). But, even when another ground for termination is sufficient, we must review challenged findings under subsections 161.001(b)(1)(D) and (E) because those findings may have significant collateral consequences for the parent's rights to another child. *In re N.G.*, 577 S.W.3d at 234 (due process requires heightened standard of review for subsection (D) and (E) findings because of potential collateral consequences to parent's rights to different child); *see also* TEX. FAM. CODE § 161.001(b)(1)(M) (allowing termination of parent's rights based on previous subsection (D) or (E) findings).

### Predicate Findings

Both Mother and Father challenge the legal and factual sufficiency of the predicate findings. Specifically, Mother challenges the trial court's predicate findings under subsections 161.001(b)(1)(D) and (O). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (O). And Father challenges the trial court's predicate findings under subsections 161.001(b)(1)(E) and (O). *See id.* § 161.001(b)(1)(E), (O).

21

## A.    Subsection (D): endangering conditions as to Mother

Mother challenges the trial court's finding under subsection 161.001(b)(1)(D) that she "knowingly placed or knowingly allowed [C.C.] to remain in conditions or surroundings which endanger the physical or emotional well-being of [C.C.]." *Id.* § 161.001(b)(1)(D).

To "endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*, 645 S.W.3d at 748; *see In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021). "Endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it does not require that conduct be directed at the child or that the child suffer injury. *In re J.W.*, 645 S.W.3d at 748 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (danger to child "may be inferred from parental misconduct" even if conduct is not directed at child and child does not suffer injury). Endangerment may occur through acts, omissions, or both. *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

While both subsections (D) and (E) focus on endangerment, they differ on the source and proof of endangerment. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Relevant to Mother, subsection (D) "focuses on the child's environment." *In re J.W.*, 645 S.W.3d at 749; *In re*

*M.D.M.*, 579 S.W.3d at 764. "[I]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under [subsection (D)]." *In re M.D.M.*, 579 S.W.3d at 764; *see In re J.W.*, 645 S.W.3d at 749 ("The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry."). A child is endangered when the child's environment "creates a potential for danger that the parent is aware of but consciously disregards." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Generally, the relevant period for evaluating this ground is before the child's removal. *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.); *but see In re J.W.*, 645 S.W.3d at 749 & n.12 (refusing to "foreclose the possibility that Subsection (D) could apply post-removal depending on the facts"). "[U]nder subsection (D), termination may be based upon only a single act or omission." *In re M.D.M.*, 579 S.W.3d at 764.

In support of her contention that she did not knowingly place or knowingly allow C.C. to remain in endangering conditions or surroundings, Mother relies on our sibling court's decision in *In re V.A.*, 598 S.W.3d 317 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). There, the mother, who allegedly had epilepsy, allowed a fire to break out, filling her apartment with smoke while her children were

23

inside and under her care. *Id.* at 322. Because no evidence addressed the mother's condition "at the time," the court found the evidence was legally insufficient to satisfy subsection (D). *Id.* at 330.

Although Mother asserts that this record is similarly silent on her postpartum mindset, medical condition, and mental health status at the time C.C. entered the Department's care, we find *V.A.* distinguishable. Mother pleaded guilty to "intentionally and knowingly engag[ing] in conduct that placed C.C. . . . in imminent danger of bodily injury and death, . . . by taking [C.C.] . . . into a burning building[.]" *See In re L.D.C.*, 622 S.W.3d 63, 71 (Tex. App.—El Paso, Feb. 2020, no pet.) ("Setting fire to a house in which [child] was sleeping is an act of arson, standing alone, is enough to justify termination under either Subsection D or Subsection E."). There was also evidence that she and Father became physically violent during arguments and argued in C.C.'s presence. And the home Mother lived in with C.C. was known by law enforcement as a gambling house and brothel. Mother continued to live with Father in the home despite claiming that Father was in the business of "selling girls" and offered to sell C.C. *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (endangerment may occur when environment creates potential for danger that parent is aware of but disregards); *see also In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—Dallas 2011, no

pet.) (parent's decision to continue living with someone who committed instances of domestic violence may support endangerment finding under subsection (D)).

Viewing the evidence in the light most favorable to the subsection (D) finding, we conclude that the trial court could reasonably form a firm belief or conviction that Mother knowingly placed or knowingly allowed C.C. to remain in conditions or surroundings which endangered her physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *see also In re J.W.*, 645 S.W.3d at 748–49; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). And considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (D) finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of its finding. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *see also In re J.F.C.*, 96 S.W.3d at 266. The trial court's predicate finding under subsection (D) is thus legally and factually sufficient.

We overrule Mother's subsection (D) issue.

## B.     Subsection (E): endangering conduct as to Father

Father challenges the trial court's finding under subsection 161.001(b)(1)(E) that he "engaged in conduct or knowingly placed [C.C.] with persons who engaged in conduct which endangers the physical or emotional well-being of [C.C.]" TEX. FAM. CODE § 161.001(b)(1)(E).

25

Termination under subsection (E) "must be based on a voluntary, deliberate, and conscious course of conduct" rather than a single act or omission. *J.O. v. Tex. Dep't of Fam. & Protective Servs.*, 604 S.W.3d 182, 191 (Tex. App.—Austin 2020, no pet.); *In re M.D.M.*, 579 S.W.3d at 764. The conduct does not have to occur in the child's presence. *In re M.D.M.*, 579 S.W.3d at 764; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("endangering conduct is not limited to actions directed towards the child" and "may include the parent's actions before the child's birth"). We may consider how a parent treated another child or a spouse. *In re M.D.M.*, 579 S.W.3d at 764. We may also consider the parent's conduct both before and after the Department removes the child from his care. *In re S.R.*, 452 S.W.3d at 360.

"Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723. A parent's abusive and violent criminal conduct can create "an environment that endangers a child's well-being, and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future." *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Father argues that the subsection (E) finding relies on assertions that (1) he was aware of Mother's mental health issues but allowed C.C. to remain in Mother's care and (2) his criminal history was endangering. As to the first assertion, Father

26

argues that the Department's neglect allegations are based only on what was in the removal affidavit. Relying on the affidavit, Father argues that there was no evidence that he ever harmed C.C. and most of the allegations involve Mother's mental health. As to the second assertion, Father argues that his criminal history predated C.C.'s birth and does not show current criminal conduct.

Under subsection (E), the relevant inquiry is whether evidence shows that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). The trial court heard evidence of domestic violence before and after C.C.'s removal. The removal affidavit states that when C.C. first came to the Department's attention, Father had injuries to an eyelid and upper brow because Mother had thrown pots and pans at him. Despite Mother's violence toward him, Father left C.C. with Mother. After he left, Mother set the apartment on fire, carried C.C. into the burning apartment, then took her to a park and threw her over a fence, which led to C.C.'s hospitalization for head injuries. Father ultimately paid the bond to release Mother from jail and continued to live with her after the domestic violence instances and despite Mother's bond or probation conditions that prevented her living with children. *See In re M.V.*, 343 S.W.3d at 547 (parent may endanger child by continuing to live with someone who committed domestic violence).

27

There was also evidence that Father was physically violent himself. Mother told McCray about instances when Father struck her in the head several times and pulled a knife on her. Although Father denied these allegations, the trial court could believe them. *See Hatteberg v. Hatteberg*, 933 S.W.2d 522, 530 (Tex. App.—Houston [1st Dist.] 1994, no writ) (factfinder may reject any part of witness testimony); *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

A background check revealed that Father has been convicted of more than a dozen criminal offenses in Utah, Minnesota, and Texas, which he was not forthcoming about. And the Department expressed concern that Father was still engaging in criminal activity based on his lifestyle. The Department presented evidence that Father was not truthful about his living situation or how he earned money. He possessed expensive items, he took C.C. home to a place known by law enforcement as a gambling house and brothel, and he did not give the Department sufficient information to verify his housing and income. *See In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012) ("[D]eportation, like incarceration, is a factor that may be considered (albeit an insufficient one in and of itself to establish endangerment), its relevance to endangerment depends on the circumstances."); *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Intentional

criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child.").

Viewing the evidence in the light most favorable to the judgment, we conclude that it is legally sufficient to support the trial court's finding under subsection (E) that Father engaged in conduct or knowingly placed C.C. with persons who engaged in conduct which endangered C.C.'s physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). And considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (E) finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of its finding. *See id.* § 161.001(b)(1)(E); *see also In re H.R.M.*, 209 S.W.3d at 108. The evidence is thus factually sufficient to support termination of Father's rights under subsection (E).

We overrule Father's subsection (E) issue.

## C. Subsection (O): failure to comply with family service plan as to Mother and Father

Parental rights may also be terminated if the trial court finds by clear and convincing evidence that the parent violated the provisions of a court order that specified the conditions for the return of a child who has been in the temporary managing conservatorship of the Department for at least nine months as a result of the child's removal from the parent under Family Code chapter 262 for the abuse or neglect of the child. TEX. FAM. CODE § 161.001(b)(1)(O); *In re R.J.G.*, 681 S.W.3d

29

370, 378 (Tex. 2023). However, the trial court may not order a subsection (O) termination if the parent proves by a preponderance of the evidence that (1) they could not comply with the provisions of the trial court's order and (2) they made a good-faith effort to comply, but the failure was not attributable to any fault of the parents. TEX. FAM. CODE § 161.001(d). The Texas Supreme Court recently clarified that "strict compliance with every detail of a service plan is not always required to avoid termination under (O)." *In re R.J.G.*, 681 S.W.3d at 379. Rather, trial courts bear the ultimate "responsibility for determining whether that finding supports termination." *Id.*

### 1. Mother

As to subsection (O), Mother does not challenge the trial court's findings that C.C. was in the Department's conservatorship for at least nine months and was removed under Chapter 262 for abuse or neglect. Instead, Mother argues that although she did not strictly or completely comply with her service plan, she complied with the material requirement to complete individual counseling.

Mother relies on *R.J.G.*, wherein the parent was ordered to and did complete individual counseling, parenting classes, substance abuse counseling, stayed drug-free, maintained a job, maintained a clean and stable home, and stayed in contact with her caseworker. *Id.* at 373. The court of appeals affirmed the judgment terminating the parent's rights under subsection (O), but the Texas Supreme Court

reversed. The Court held that there was legally insufficient evidence because the termination rested on evidence that the parent failed to meet a requirement not expressly stated in the service plan. *Id*. at 383.

Although there are similarities between this case and *R.J.G.*, it is more like this Court's recent decision in *In re B.J.F.* No. 01-23-00522-CV, 2024 WL 117174 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.). There, the mother had to maintain safe and stable housing; maintain contact with the Department; refrain from criminal activities, incurring additional criminal charges, and abide by the terms of her case; complete the plan's substance abuse requirements; and participate in the case by attending court hearings, visitations with her child, and all other required meetings. *Id*. at *18–20. The mother provided a one-year lease set to begin two weeks before the trial date. *Id*. at *18. This Court held that the lease reflected the mother's intention to maintain safe and stable housing for at least six months in the future but did not show, as the service plan required, that the mother's housing would be maintained throughout the case. *Id*. As for the requirement to participate in the case by attending court hearings and parent-child visits, the mother missed several hearings and did not visit with the child for the first ten months of the CPS case. *Id*. This Court posited that the mother's visits with her young daughter fostered their familial relationship and were critical to the mother's reunification with the child. *Id*.

31

Here, Mother was required to maintain safe and stable housing; provide proof of housing; update the caseworker within 24 hours of moving; update the caseworker of other occupants within 48 hours; and attend all visits, court hearings, and conferences. Mother was incarcerated for endangering C.C. until March 2023. The permanency report notes that Mother did not provide the Department with proof of stable housing or income. Mother also failed to provide the caseworker with updates when she moved. Although Mother admitted to domestic violence between her and Father, she stayed with him after her release from jail.

At trial, Le testified that she allowed Mother to reside with her after knowing her for one or two weeks. But Mother then moved back in with Father, even though Mother claimed that Father had previously assaulted her. The record thus shows that Mother did not demonstrate that she had safe or stable housing as required by the family service plan. *See In re J.W.*, 645 S.W.3d at 742 (holding legally sufficient evidence supported termination of parental rights under subsection (O) solely because parent failed to maintain safe and stable home environment).

Because of Mother's incarceration for most of the case, she missed multiple court hearings. Her bond conditions also prohibited her from seeing C.C., and a condition for her deferred adjudication was not to have contact with any child under age 17 for five years. Mother also did not provide accurate information in her

32

psychosocial assessment as required by her family service plan. Finally, Mother conceded that she did not complete domestic violence classes.

Even considering the Texas Supreme Court's recent guidance on subsection (O) findings, the record here provided legally and factually sufficient evidence that Mother failed to comply with several material provisions of her service plan.

We overrule Mother's subsection (O) issue.

## 2. Father

Father also does not challenge the trial court's findings that C.C. was in the Department's conservatorship for at least nine months and was removed under Chapter 262 for abuse or neglect. He disputes that he failed to comply with the family service plan and whether the subsection (O) finding was improper under section 161.001(d) of the Family Code. We disagree.

Father's family service plan required that he: obtain employment; obtain safe and stable housing; notify the caseworker within 24 hours of a relocation; provide identifying information of home occupants within 48 hours of that person moving in; complete parenting classes; maintain communication with the caseworker; attend all visits, court hearings, meetings, conferences, and notify the caseworker of late or missed visits, hearings, meetings, or conferences 24 hours in advance; establish paternity; submit to a psychosocial assessment and follow all recommendations; and not engage in criminal activity.

The record shows that Father failed to obtain safe and stable housing as required by the service plan. While Father allowed the Department to conduct random home visits, McCray testified that the home was not appropriate for a child. McCray informed Father several times of his concerns as he visited Father's three residences. McCray stated that "there was always trash . . . there's bugs flying around the entrance of the home and in the back." Father also violated his service plan by not giving the Department information about his brother who resided with him. The copy of a lease Father provided did not provide the landlord's contact information, despite the Department's request for it. The Department also expressed concern that, even if the lease were valid, Father had moved three times in one year.

Next, Father did not maintain employment as required by his family service plan. Father was unemployed at the time of trial. Throughout the pendency of the case, the Department was unable to verify Father's previous employment at the Charming Cafe. Father testified that he was a cook at Charming Cafe for no more than six months. But the record has only two paychecks provided by Father, both from his alleged subsequent employer, Friendship BBQ, whose owner Father never knew. The child advocate's report noted that the Charming Cafe manager first denied knowing Father before later reporting that he was a chef there. At trial, the child advocate testified that she tried to verify Father's employment by visiting the restaurant twice. The manager she spoke with had never heard of Father.

Father was also required to complete a psychosocial assessment and submit accurate information as part of that assessment. The psychosocial assessment noted that Father was "irritable, wary, tense, inattentive," "minimally communicative," "minimally cooperative," and "seemingly with[held] information" during the session. The therapist noted that, because Father "may not have been fully forthcoming in answering the assessment questions," the assessment results could be inaccurate.

Father argues that any inconsistency in his assessment answers resulted from English not being his first language and inadequate translation. Father told the Department that he had been in the United States for 15 years, and his criminal history showed that he picked up his first charge in the United States in January 2007. But the assessment noted that Father reported only having been in the United States for 10 years.

At trial, when asked if he had testified at an earlier hearing that he did not have any criminal charges other than traffic tickets, Father responded, "I did not say that" then clarified that "I did have a criminal record; however, the offenses [did not occur] in Texas." Father failed to answer when his last probation ended and did not know exactly how many times he had been arrested. When asked about whether he spoke with the caseworker in English he responded, "Yes." When asked by the trial court about the apartment fire, Father replied, "It was not my apartment. It was my

35

friend's apartment." And finally, when asked about his answers in the psychosocial assessment, Father admitted, "I didn't really want to tell them whether I have a criminal record or not."

Father claims that he regularly visited C.C. throughout the case. But the record reflects that he did not attend all visits. McCray testified that Father missed two visits in September and October. He also clarified that although the permanency report stated Father attended all visits in May, Father missed both May visits. Foster Mother also testified that Father missed 29 percent of total visits throughout the case and 40 percent of visits after trial commenced.

In short, Father struggled to maintain safe and stable housing; he failed to provide the Department with verifiable information for his residence, other occupants of his residence, and his employer; he was not truthful during his assessments; and he failed to attend all visitations with C.C. The record thus shows legally and factually sufficient evidence that Father failed to comply with several material provisions of his family service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(O).

Father also contends that section 161.001(d) should have precluded the trial court from terminating his parental rights under subsection (O). *Id.* § 161.001(d) (providing defense when parent is unable to comply with court order despite good faith attempt); *see also In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019).

Father again asserts that he did not understand certain questions because he lacks fluency in English and had inadequate translation. The Department responds that because Father did not raise the section 161.001(d) affirmative defense during the proceedings, it is waived. Assuming without deciding that there is no waiver, we conclude that Father failed to meet his burden of proof.

As discussed above, the record contains Father's family service plan, his requirements under it, and the ways in which he failed to satisfy those requirements. Some of those shortcomings included failing to provide the requisite number of paycheck stubs to verify his employment, failing to provide information on other occupants in his residence, and failing to provide verifiable proof that his residence was in his name. The record does not show that any of those issues stem from translation inconsistencies during his assessment or testimony. The trial court made no findings in support of any of Father's arguments as it relates to his affirmative defense. *See In re C.M.*, 996 S.W.2d 269, 270 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The only finding made by the trial court in this regard is that Father failed to raise a defense based on Family Code section 161.001(d) to the finding under subsection (O). Deferring to the trial court's role as factfinder and judge of witness credibility and the weight to be given to their testimony, we cannot say that the trial court erred in concluding that Father failed to prove by a preponderance of the

evidence that his failure to comply with his family service plan was "not attributable to any fault" of his own. *See* TEX. FAM. CODE § 161.001(d)(2).

We conclude that the evidence is legally and factually sufficient to support the trial court's finding that Father did not carry his burden of proof under section 161.001(d). Therefore, considering our analysis above, termination was proper under subsection (O).

We overrule Mother's and Father's subsection (O) issues.

## Best Interest Findings

Mother and Father also challenge the legal and factual sufficiency of the evidence that terminating their parental rights was in C.C.'s best interest.

## A.     Best interest factors

A strong presumption exists that a child's best interest is served by keeping the child with her natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But a best-interest analysis is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631.

In determining whether evidence supports a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). A parent's past conduct is probative of their future conduct. *See Jordan*, 325 S.W.3d at 724. Evidence probative of a child's best interest may be the same evidence probative of

a subsection (b)(1) ground. *In re E.C.R.*, 402 S.W.3d at 249; *see* TEX. FAM. CODE § 161.001(b)(1), (2).

We also consider several factors that the factfinder may apply in determining the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see In re E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some may not apply to all cases. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.*

Additionally, we may consider the factors set forth in Family Code section 263.307, including: (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the

39

child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

## B.  Analysis

### 1.  Child's Desires and Plans for the Child

C.C., only one year old when trial began, was too young to express her desires. When a child is too young to make her desires known, the trial court may consider the bond between the child and her foster family, whether she has been well cared for by them, and the time she has spent with her natural parents. *In re A.H.L.*, No. 01-16-00784-CV, 2017 WL 1149222, at *5 (Tex. App.—Houston [1st Dist.] Mar. 28, 2017, pet. denied) (mem. op.).

The evidence showed that C.C.'s bond with her foster parents, who have cared for her almost since birth and have provided for her medical and developmental needs, was strong. McCray testified that C.C. had been in the same foster home since

June 2022. He witnessed C.C. in the home and described the foster family's relationship with C.C. as wonderful. Describing C.C.'s condition when she first arrived in her home, Foster Mother observed that C.C. was underweight for her age and had a scar on her left ankle and a subdural hematoma. As for C.C.'s current health status, Foster Mother stated that C.C. was meeting her developmental milestones but still had some physical disabilities. Foster Mother testified about C.C.'s frequent medical appointments, noting that C.C. goes to see a neurologist quarterly to ensure she does not have long-term brain or development issues. She added that C.C. also has physical therapy three times per month and completes additional at-home exercises to meet her physical therapy goals. Foster Mother expressed her desire to adopt C.C. Additionally, C.C.'s foster family has provided C.C. with books in Mandarin and a Chinese doll and plan to enroll her in Mandarin classes. C.C. calls her foster parents "Mommy and Daddy."

In contrast, the short time C.C. spent in Mother and Father's care was fraught and resulted in injuries to C.C. In the two weeks that C.C. lived with Mother and Father, the Department received multiple referrals alleging neglect and abuse. Domestic violence occurred between Mother and Father, and Mother set fire to their home with C.C. inside before attempting to "dispose" of C.C. at the bayou nearby. C.C. suffered a head injury.

Mother acknowledged C.C.'s bond with her foster parents and that she could not strengthen her natural bond with C.C. through visitation because of her criminal charge. Mother was incarcerated on charges of child endangerment until March 2023, two months before trial. While Mother's friend and witness, Le, testified that she could take C.C., she admitted that she had not contacted the Department before her testimony to express any desire to do so.

Father also recognized that C.C. was doing well in her foster home, but he claimed to have bonded with C.C. during visitation. At trial, however, McCray testified that Father did not attend all his visits with C.C. And Foster Mother testified that Father missed 29 percent of all visits with C.C. and 40 percent of visits after trial started. Foster Mother also stated that when Father did visit, there were times that he would not change C.C.'s diaper, and that C.C. did not receive any gifts from her parents for her birthday.

Considering this evidence, the factfinder reasonably could conclude that these factors weighed in favor of terminating Mother's and Father's parental rights.

### 2.    Danger to the Child and Child's Present and Future Needs

As discussed above, both parents engaged in conduct showing their inability to provide C.C. a safe or stable environment. *In re S.R.H.*, No. 01-15-00714-CV, 2016 WL 430462, at *10 (Tex. App.—Houston [1st Dist.] Feb. 4, 2016, no pet.) (mem. op.) (evidence of endangerment may also support best interest finding).

42

The Department received its initial referral because of domestic violence between the parents. Father had cuts to his eyelid and upper brow. He told law enforcement that Mother threw objects at him but denied wanting to press charges. A subsequent referral alleged that Mother set their apartment on fire while C.C. was inside, attempting to "dispose" of C.C. near the bayou, and when C.C. was taken to the hospital afterward, she had a head injury.

During the Department's investigation, Mother stated that Father trafficked women for money and the only other person in her support system was also involved in human trafficking. Mother was charged with child endangerment and spent most of C.C.'s life incarcerated before her release in March 2023. She later pleaded guilty to child endangerment and received deferred adjudication. Mother's bond conditions prohibited her from having any contact with C.C., and one of the conditions of her deferred adjudication prohibits contact with any child below the age of 17. *In re J.D.S.*, No. 01-10-00767-CV, 2011 WL 4398554, at *6 (Tex. App.—Houston [1st Dist.] Sept. 22, 2011, no pet.) (mem. op.) (parent's incarceration can negatively impact child's living environment and emotional well-being). Upon her release, Mother lived with Father but left because he hit her. According to Le, Mother later returned to live with Father again.

Mother conceded on appeal that she has mental health issues that may prevent her from ever meeting C.C.'s needs. She also conceded that if Father remains in

Mother's life, Mother will be unable to protect her child from present and future physical and emotional danger. Father also acknowledged that Mother's behavior was concerning, but he argues that the Department failed to provide evidence that he could not meet C.C.'s emotional and physical needs. He also asserts that he was the one who initiated the case, thereby demonstrating his protectiveness when C.C. faced emotional and physical danger. During the Department's investigation, Mother told the Department that Father sold girls for money and tried to sell C.C. In the same interview, Mother claimed to have large sums of money with her at the hospital. Law enforcement advised the Department's investigator that the home C.C. lived in was known for gambling and sex trafficking. Both parents also admitted that domestic violence occurred between them.

Neither parent completed their family service plans. Mother did not complete her domestic violence classes. The Department expressed concern about Mother and Father's living arrangement because of Mother's bond and deferred adjudication conditions. The Department was concerned that Father would not adequately protect C.C., considering Mother's child endangerment conviction. There was also evidence that Father assaulted Mother after the termination proceedings began.

The parents' failure to address the Department's concerns by not completing their family service plans supports the trial court's conclusion that they could not provide C.C. with a safe environment now or in the future. *See Holley*, 544 S.W.2d

44

at 371–72 (discussing factors two and three regarding danger to the child, and the child's emotional and physical needs).

### 3. Parental Abilities and Stability

"A parent's inability to provide adequate care for [their] children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest." *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The government has a compelling interest in establishing a stable, permanent home for a child. *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Here, there was little evidence of Mother's and Father's parental abilities, and their instability throughout the case concerned the Department. Mother was incarcerated on the child endangerment charge until March 2023. After she was released, Mother lived with Father until he assaulted her. She later returned to living with him.

Father moved into three different homes during the case, and at each residence, the Department noted unsanitary conditions. Although the child advocate later described Father's residence as "appropriate," Father violated the terms of his family service plan by not reporting that someone else, his brother, lived with him. Father did not give the Department any verifiable information about his brother. Father also did not provide the Department with verifiable copies of his leases. Father provided one lease as an exhibit at trial, but it lacked the landlord's contact

45

information. Father's employment was also unverified. At removal, Father asserted that he could care for C.C. because he was unemployed. When he reported gaining employment, Father failed to provide the Department with sufficiently verifiable information and visits to Father's work left the Department with doubts about his employment because of inconsistencies in the information provided by Father and his employer.

Father also was not truthful with the Department when he withheld information about his criminal history because he "didn't really want to tell" the Department about it. Most of his criminal history involved crimes of fraud or deception. During the termination proceedings, Father was seen driving an expensive vehicle and the child advocate reported seeing luxury goods at his residence, neither of which a restaurant cook could normally afford.

Mother also conceded that she is not ready to be a protective parent and that the foster parents are strong candidates for adoption. As discussed, Foster Mother described that she and her husband take C.C. to various medical appointments and complete at-home exercises with C.C. to protect against long-term developmental issues. They also expressed their desire to adopt C.C. and incorporate aspects of her culture into her life.

Here, there was evidence showing that Mother and Father lacked the necessary parental abilities and motivation to be proper parents for C.C., and that

foster parents were providing significant amounts of medical care for C.C. *See Holley*, 544 S.W.2d at 371–72 (discussing factors four and eight regarding parenting ability and acts or omissions indicating improper parent-child relationship). Heeding these factors, along with the whole record, a factfinder could reasonably conclude that terminating Mother's and Father's parental rights was in C.C.'s best interest. *See In re C.H.*, 89 S.W.3d at 28 (noting evidence about placement plans and adoption are relevant to best interest but must be considered in context of entire record).

### 4. Available Programs and Parents' Acts or Omissions

Mother contends that because of her natural bond to C.C., completion of counseling and parenting classes, and willingness to participate in services upon release from jail, there is insufficient evidence to support the trial court's best-interest finding. While the evidence shows that Mother completed some classes required by her family service plan, she failed to complete others such as her domestic violence classes.

Father argues that there was no evidence or witness testimony on the availability of programs to assist him so this factor is neutral. But Mother's and Father's family service plans were tailored to address the issues that resulted in C.C.'s removal. *See In re D.R.A.*, 374 S.W.3d at 535 (considering classes and programs included in parent's family service plan). To that point, Father has completed his parenting classes, is attending counseling sessions, and completed his

47

psychological assessment. But he was not truthful during his psychological assessment when discussing his criminal history.

Finally, we consider acts or omissions by Mother and Father indicating that the existing parent-child relationship is improper and any excuses they have for their behavior. While in Mother's and Father's care, C.C. was endangered not only by instances of domestic violence between the parents, but directly when the apartment she lived in was set on fire. C.C. suffered smoke inhalation and a head injury. Mother was detained for nine months while C.C. was in the Department's custody because she was charged with endangering C.C., and now she is on deferred adjudication which prohibits her from being around C.C.

As for Father, the evidence showed that he failed to visit C.C. 29 percent of the time, including during her birth month. *See In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (considering parent's inconsistent visitations with child and other failures in complying with family service plan). He also did not give the Department the information necessary to verify his housing or employment, and he did not disclose his criminal history until a background check revealed extensive misdemeanor and felony convictions.

Considering the relevant factors and viewing the evidence in the appropriate light, we hold that there is legally and factually sufficient evidence that terminating

Mother's and Father's parental rights was in C.C.'s best interest. *See* TEX. FAM.

CODE § 106.001(2); *Holley,* 544 S.W.2d at 371–72.

We overrule Mother's and Father's final issues.

## Conclusion

We affirm the trial court's order.


Sarah Beth Landau
Justice

Panel consists of Justices Goodman, Landau, and Hightower.